**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---------------------------------------------------------

THE TRAVELERS INDEMNITY      :
COMPANY,      :
     :
           Plaintiff,      :
     :      Civ. No. 04-5699 (DRD)
         v.      :
     :
     :
DAMMANN & CO., INC. and      :
INTERNATIONAL FLAVORS &      :
FRAGRANCES, INC.,      :      **O P I N I O N**
     :
           Defendants.      :

---------------------------------------------------------

DAMMANN & CO., INC.,      :
     :
           Defendant/      :
           Third-Party      :
           Plaintiff,      :
     :
         v.      :
     :
     :
COOPERATIVE BUSINESS      :
INTERNATIONAL, INC., and      :
NATIONWIDE MUTUAL      :
INSURANCE COMPANY,      :
     :
           Third-Party      :
           Defendants.      :

---------------------------------------------------------

Frank E. Borowsky, Jr., Esq.
BOROWSKY & BOROWSKY, LLC
59 Avenue at the Common
Suites 101 & 102
Shrewsbury, NJ 07702

*Attorneys for Plaintiff*

Robert G. Rose, Esq.
PITNEY HARDIN, LLP
P.O. Box 1945
Morristown, NJ 07962-1945

*Attorney for Defendant International Flavors & Fragrances, Inc.*

Eugene R. Anderson, Esq. (admitted *pro hac vice*)
Nicholas M. Insua, Esq.
Lauren B. Sobel, Esq.
ANDERSON KILL & OLICK, P.C.
One Gateway Center, Suite 1510
Newark, NJ 07102

Rhonda D. Orin, Esq.
ANDERSON KILL & OLICK, P.C.
2100 M Street N.W.
Washington, DC 20037

*Attorney for Defendant Dammann & Co., Inc.*

**<u>DEBEVOISE, Senior District Judge</u>**

Plaintiff, The Travelers Indemnity Company ("Travelers"), filed a complaint on November 17, 2004 (the "Complaint") seeking a declaration of non-liability under two insurance policies which it issued to defendant, Dammann & Co., Inc. ("Dammann"). Dammann filed a counterclaim seeking a declaration that Travelers is obligated to provide coverage related to IFF's claims, and brought additional counterclaims for breach of contract, breach of fiduciary duty, and breach of the duty of good faith and fair dealing. Dammann then commenced a third-party claim for indemnity against Cooperative Business International, Inc. ("CBI") and CBI's liability insurance company, Nationwide Mutual Insurance Company ("Nationwide"). On

January 18, 2005, defendant, International Flavors & Fragrances, Inc.("IFF") moved to dismiss the Complaint against it, contending that it should not be a party to the case because there is no justiciable controversy between Travelers and IFF.  On December 12, 2005, the court denied IFF's motion, finding: (1) that there exists an actual controversy between Travelers and IFF; and (2) that the action against IFF is appropriate under the Declaratory Judgment Act.

Travelers now moves for summary judgment against Dammann and IFF, pursuant to Fed. R. Civ. P. 56(c).   For the reasons set forth below, Travelers's motion will be denied.

## I.  BACKGROUND

Dammann produces raw foods, including vanilla beans, and distributes them to processed food manufacturers who pass the products on, in various reincarnations, for consumption.  IFF manufacturers food flavorings, including vanilla extract.  On April 16, 2004, Dammann and IFF entered into a contract (the "Contract")  pursuant to which Dammann agreed to deliver vanilla beans to IFF.  (Compl. ¶ 4).  On or about March 29, 2004, IFF discovered that certain lots of Indonesian vanilla beans supplied to it between January 14 and 30, 2004 by Dammann may have been contaminated with mercury. (Id. ¶ 5).  Thereafter, IFF sent a letter enumerating its claims for damages against Dammann for the alleged failure to deliver vanilla beans that conformed to the Contract.

Travelers further alleges that it issued to Dammann a general commercial liability insurance policy, along with an excess insurance policy (described infra).  Travelers acknowledges that the Policies were effective during the time period from September 25, 2003 through September 25, 2004, but denies that it owes coverage under the Policies to any claims which may arise from IFF's allegations.  (Id. ¶ 7.)

3

By letter dated April 2, 2004 to the Recall Coordinator of the Food & Drug Administration (FDA), counsel for IFF indicated that IFF discovered that two lots of Indonesian vanilla beans that it had received were contaminated with mercury.  (Pl.'s Br. at Ex. D.)  By a letter dated April 5, 2004, IFF informed Dammann of its alleged discovery of mercury contamination in the vanilla beans, and its conclusion that the contamination was caused by injections of mercury by Indonesian farmers seeking to boost the weight of crop yields.   (Id. at Ex. E.)

Dammann filed an insurance claim with Travelers which Travelers denied.  Apparently in anticipation of actions against it by Dammann and IFF, Travelers commenced this suit.

**A.    IFF's Claim Letter**

By a letter dated May 25, 2004 (the "Claim Letter") from IFF to Dammann, IFF set forth a claim for damages, totaling $5,189,924, allegedly caused by the mercury contamination of the vanilla beans.  The Claim Letter includes a lengthy recitation of the events according to IFF, followed by a description of the damages, as follows:

> The 5 Metric Tons of vanilla beans received from Dammann had all been processed into extract.  The extract, which had been produced, as well as other product streams from the extraction process, were also used in downstream products and flavors.  The use of material associated with these lots of beans by lot trace expands the damage associated with this contamination.

(Id. at 2.)  The letter itemizes the damages, including the value of manufactured vanilla extract which had already been shipped to customers–$247,379–and the value of manufactured extract not yet shipped–$4,240,351. (Id.)  The sum of these items, along with figures for what IFF calls "testing," "remediation/cleaning," "recovery," "disposal," "customer service impact," "other"

4

and "replacement costs," yields IFF's damages total of $5,189,924.  (Id.)

On or about June 3, 2004, MPPI, Inc., Dammann's insurance producer, submitted a "General Liability Notice of Occurrence/Claim" to Travelers, notifying Travelers of IFF's claim. (Pl's Br. at Ex. F)  By letter dated June 28, 2004, Travelers stated that it would initiate an investigation into the "facts and circumstances" of the matter and that the investigation would be subject to certain reservations.  (Id. at Ex. G.)

By letter dated November 4, 2004, Travelers denied coverage for the claims asserted by IFF.  (Id. at Ex. H.)  The letter explained that Travelers was denying coverage because: (1) the items of damages do not constitute "property damage" as defined by the insurance policies; (2) the failure of Dammann to provide IFF with conforming products does not constitute an "occurrence" under the policies; and (3) the claim is excluded from coverage by the contractual liability exclusion and business risk exclusions in the policies.  (Id.)

## B.    **The Insurance Policies**

Travelers issued two insurance policies to Dammann: (1) a Commercial General Liability Policy (I-660-550X7647-IND-03) for the policy period from September 25, 2003 to September 25, 2004 (the "CGL Policy"); and (2) a Commercial Excess Liability (Umbrella) Policy (ISF-CUP-440H1291-IND-03) for the same time period (the "Umbrella Policy").  (Id. at Exs. I, J.)  The CGL Policy states that Travelers "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this

5

insurance applies." (Id. at Ex. I.)  The CGL Policy applies to "bodily injury" and "property damage" only if it is "caused by an 'occurrence' that takes place in a 'covered territory' during the policy period." (Id.)  Under the Umbrella Policy, Travelers "will pay on behalf of the insured the 'ultimate net loss' in excess of the 'applicable underlying limit' which the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies." (Id. at Ex. J.)  The Umbrella Policy applies only to "bodily injury" or "property damage" caused by an "occurrence" during the policy period and to "personal injury" or "advertising injury" caused by an "offense" committed during the policy period.  (Id.)

## C.   **Discovery Issues**

            Dammann argues that summary judgment is not yet appropriate, citing the need for additional materials which it claims it is entitled to discover in order to be able fairly to oppose Travelers's motion.

## II.  **STANDARD OF REVIEW**

        Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the

applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant

of summary judgment.  Id.  In deciding whether there is a disputed issue of material fact, the

court must view the evidence in favor of the nonmoving party by extending any reasonable

favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be

believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v.

Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson, 477 U.S. at 255).


### III.  DISCUSSION


**A.  Travelers's Liability**


A court exercising diversity jurisdiction over an insurance dispute must apply state

substantive law.  See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938).  The parties in

the present case submit that New Jersey law applies.  Under New Jersey law, it is the insured's

burden to bring the claim within the basic terms of the policy when there is a dispute over the

interpretation of an insurance contract.  See Rosario ex rel. Rosario v. Haywood, 351 N.J.Super.

521, 799 A.2d 32, 37 (N.J.Super.Ct.App.Div. 2002).  In general, New Jersey courts have

consistently regarded insurance contracts as contracts of adhesion and, consequently, subject to

special rules of interpretation. Villa Enters. Mgt. Ltd. v. Federal Ins. Co., 360 NJ Super 166, 821

A2d 1174 (2002).


In County of Hudson v. Selective Ins. Co., the court explained the basic rules for

interpreting insurance policies:

[A]lthough insurance policies are contractual in nature, they are not ordinary agreements; they are contracts of adhesion and, as such, are subject to special rules of interpretation. Consequently, we are directed to take a broad and liberal view so that the policy is construed in favor of the insured. ... [P]urchasers of insurance are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. And their policies should be construed liberally in their favor to the end that coverage is afforded to the full extent that any fair interpretation will allow. Moreover, it is fundamental that ambiguities in an insurance policy are to be interpreted in favor of the insured.... In construing an ambiguous provision, courts should consider whether more precise language by the insurer, had such language been included in the policy, would have put the matter beyond reasonable question.

332 N.J.Super. 107, 752 A.2d 849, 852 (App.Div. 2000)(internal citations omitted).

Typically, in a suit for declaratory judgment that an insurer has no duty to defend, the insured has already been sued by a third-party in an underlying action.  The issue then is whether the complaint in the underlying action alleges claims that are covered under the insured's insurance policy.  Merchants Ins. Co. of New Hampshire, Inc. v. Hessler, 2005 WL 2009902 at *3 (D.N.J. 2005).  "Whether an insurer has a duty to defend is determined by comparing the allegations in the complaint with the language of the policy.  When the two correspond, the duty to defend arises, irrespective of the claim's actual merit."  Id. (citing Voorhees v. Preferred Mutual Ins. Co., 128 N.J. 165, 173 (1992)).

In this case, since there is no underlying complaint with which to compare the policy (the insured has not been sued), the court will look to the allegations set forth in the Claim Letter to determine whether any of the claims, as stated, fall within the scope of the policy.

The duty to defend is "determined by whether the allegations set forth in the complainant's pleadings fall within the purview of the policy language," not based upon the

merits of the claims. <u>Kaminecki v. Scottsdale Ins. Co.</u>,  2005 WL 1868736 at *2 (D.N.J. 2005)

(<u>citing</u> <u>LCS Inc. v. Lexington Insurance Co.</u>, 371 N .J.Super. 482, 490 (App.Div 2004) and <u>Ohio</u>

<u>Casualty Insurance Co. v. Flanagin</u>, 44 N.J. 504, 512 (1965)).  In cases where "multiple

alternative courses of action are set forth," such as the case sub judice, "the duty to defend will

continue until every covered claim is eliminated."  <u>Id.</u>  In this case, the Claim Letter enumerates

damages which include the cost to IFF of the contaminated vanilla extract, the loss of use of the

vanilla extract and production equipment, exposure to liability for bodily injury, and the cost of

clean-up of its equipment and remediation.  Taking these allegations as true, the court must

determine whether the alleged facts square with the Policies.

Travelers contends that, for two separate reasons, the allegations do not fall within the

terms of coverage of the Policies.  First, Travelers argues that the allegations do not set forth an

"occurrence" as defined by the coverage and exclusionary provisions of the Policies.  And,

second, Travelers argues that the allegations do not set forth a claim for damage to a third-party's

property as defined by the coverage and exclusionary terms of the Policies.  Dammann argues

that the Claim Letter indeed sets forth facts constituting an "occurrence" of damage consisting of

actual injury to property, along with "property damage" in the form of  "loss of use" of both the

vanilla extract and the related production equipment.

## 1. Occurrence

Under the terms of the CGL policy, as set forth in the "Commercial General Liability

Coverage Form" (the "CGL Form") attached to Dammann's Motion for Summary Judgment as

Exhibit I, "'[o]ccurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Id. at 10.)

Travelers argues that IFF's allegations do not constitute an occurrence because any claims arising from them sound in contract, rather than in tort.  Travelers insists that IFF's allegations present nothing more than a list of costs associated with Dammann's failure to provide vanilla beans which conformed to the Contract.  However, IFF's claims articulate circumstances that rise above a mere "accident of faulty workmanship" and, instead, constitute "faulty workmanship that causes an accident."  See Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 249 (1979).

In Weedo--the seminal New Jersey case on this issue--the New Jersey Supreme Court explained the distinction between the purely contractual damages not covered by this sort of insurance policy, and the tort damages which are covered:

> The consequence of not performing well is part of every business venture; the replacement of repair of faulty goods or works is a business expense, to be borne by the insured-contractor in order to satisfy customers. There exists another form of risk in the insured-contractor's line or work, that is injury to people and damage to property caused by faulty workmanship. Unlike [faulty workmanship on its own], where the tradesman commonly absorbs the cost attendant upon the repair of his faulty work, the accidental injury to property or persons substantially caused by his unworkmanlike performance exposes the contractor to almost limitless liabilities. While it may be true that the same neglectful craftsmanship can be the cause of both a business expense of repair and a loss represented by damage to persons and property, the two consequences are vastly different in relation to sharing the cost of such risks as a matter of insurance underwriting. The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable.

Id. at 239 (citations omitted).

In this case, the faulty workmanship has indeed caused dissatisfaction which can be repaired by replacement or by paying contractual damages aimed at placing IFF in the position it would have been in had the terms of the contract been properly executed; however, the failure of Dammann to conform its product to the terms of the Contract has also allegedly caused tort damages.  Specifically, IFF's claims include damages for clean up and remediation, and damage to IFF's property (see part 2, infra), and exposure to liability to other parties which may have used the contaminated vanilla extract.

Travelers cites several cases in support of its contention that the Claim Letter seeks damages only arising from breach of contract, but the cases are distinguishable and Travelers's argument is unavailing.  For example, in Atlantic Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J. Super. 224 (App. Div. 2006), coverage for defendant's liability to a third-party for ammonia contamination of carbonated beverages was barred by the CGL policy because the claims were for costs associated with defendant's failure to provide the product it promised.  The defendant had bottled the beverages itself and then sold them to a third-party, and the claims arose exclusively from the third-party's demand to be supplied with the product it had ordered.  Unlike the present claims made by IFF, the claims in Atlantic did not arise from allegations of physical damage and liability for injury.  The IFF claims are not for faulty workmanship alone, but also for the damage to IFF's property and exposure to liability for bodily injury, all as a result of the contaminated vanilla beans.

In <u>Firemen's Ins. Co. of Newark v. National Union Fire Ins. Co.</u>, 387 N.J. Super. 434 (App. Div. 2006), the court found that the defendant's claim for replacing sub-standard firewalls did not constitute an occurrence because the third-party was suing exclusively for the defendant's failure to uphold the baragained-for exchange.  The faulty workmanship was not by itself an "occurrence" because there was no bodily injury or third-party property damage.  <u>Id.</u>  Here, the Claim Letter does set forth allegations of property damage and exposure to liability for bodily injury, and so the claims arising from the allegations are distinct from the contract-only claims in <u>Firemans</u>.

In <u>Newark Ins. Co. v. Acupac Packaging, Inc.</u>, the court held that where the underlying complaint asserted damages to a third-party's property, defendant's claims for damages fell within the scope of an "occurrence."   328 N.J. Super. 385 (App. Div. 2000).  In <u>Acupac</u>, the court held that the claim fell within the scope of an occurrence as articulated in the insurance policy because tort liability arose from alleged property damage resulting from faulty workmanship, and the claims sought more than mere contract damages.  <u>Id.</u>

Since IFF alleges facts which give rise to claims that constitute an "occurrence" as a matter of law, it cannot be said that Travelers would have no duty to defend against IFF's allegations in the event that IFF, or some other party, serves a more formal incarnation of the same.

**2. Damage to IFF's Product**

Travelers also argues that the Claim Letter does not set forth allegations of "property

12

damage" as defined by the Policies, particularly in light of the Policies' exclusionary provisions. Specifically, Travelers argues that the damages alleged in IFF's claim relate to property produced by Dammann–the vanilla beans–and therefore not covered by the Policies, or property produced by IFF–the vanilla extract–so closely-related to the vanilla beans as to be excluded by the Policies.

It is "well settled that when interpreting insurance contracts the court should broadly read coverage provisions, and narrowly read exclusionary provisions." Westport Ins. Corp. v. Crum & Forster Ins. Co., 2001 WL 274328 at *4 (D.N.J. 2001) (citing Search EDP v. American Home Assur., 267 N.J.Super. 537, 542 (App. Div.), cert. denied, 135 N.J. 466 (1994)).

a. Coverage

Under the terms of the Policies, Travelers "will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" resulting from an "occurrence." (CGL Form at 1.) Having found that the Claim Letter alleges an "occurrence" leading to "property damage," the court next turns to the definition of "property damage" set forth by the Policies:

"Property damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

13

(CGL Form at 11.)

Since the allegations include damage to tangible property–vanilla extract and production equipment–the court need not employ a particularly broad reading of these provisions to find that, indeed, IFF's claims are covered by the CGL.

b.  <u>Exclusions</u>

Travelers contends that the property damage alleged is excluded from coverage by several provisions of the Policies.  The pertinent exclusionary terms include:

>k.  Damage to Your Product
>
>"Property damage" to "your product" arising out of it or any part of it.
>
>\*\*\*
>
>m.  Damage to Impaired Property or Property Not Physically Injured
>
>"Property damage" to "impaired property" or property that has not been physically injured arising out of:
>
>(1)  a defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or
>
>(2)  a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
>This exclusion does not apply to the loss of use of other property arising out of sudden or accidental physical injury to "your product" or "your work" after it has been put to its intended use.
>
>n.  Recall of Products, Work or Impaired Property
>
> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of:
>
>(1)  "Your product;"

14

(2)  "Your work;" or

(3) "Impaired property;"

if such product, work ,or property is *withdrawn or recalled from
the market* or from use by any person or organization because of a
known or suspected defect, deficiency, inadequacy, or dangerous
condition to it.

(Id. at 4).

By its express terms, exclusion "m" only applies if the property has not been physically

injured or is not impaired.  Here, the allegations are for damages including physical injury to

property, and to the extent the allegations involve mere impairment, the vanilla extract, at least,

cannot be restored to use by the repair, replacement, adjustment or removal of Dammann's

product or work.  See Newark Ins. Co. v. Acupac Packaging, Inc., 328 N.J.Super. 385, 392-3,

746 A.2d 47, 51 (App. Div. 2000).

In Acupac, the court explained that because the claims for coverage were "asserted for

damage to property that was the property of others, separate and distinct from the [defendant's

property]" it did not fall within the language of Exclusion M of the insurance policies."  Id. at 55.

The court further explained that "[t]he business risk exclusion only applies regarding claims for

damages to the insured's own work arising out of his faulty workmanship, and does not exclude

damage to other property not manufactured or provided by the insured, yet caused by the

insured's poor performance."  Id. at 55.

Travelers also raises exclusion "n"–the "recall exclusion"–as barring coverage, citing

Atlantic Mut. Ins. Co. v. Hillside Bottling Co., Inc., in which the court held:

15

We have interpreted the sistership exclusion to mean that it limits coverage when the manufacturer recalls all of the products rather than only those with a defect. See Acupac, supra, 328 N.J.Super. at 402, 746 A.2d 47. The federal district court in New Jersey, applying New Jersey law and citing Weedo, has similarly concluded that general product recall costs are outside the coverage of the policy. See *240 McNeilab, Inc. v. No. River Ins. Co., 645 F.Supp. 525, 539 (D.N.J.1986), aff'd, 831 F.2d 287 (3d Cir.1987). Applying this reasoning to the facts in this record, we conclude that exclusion "n" bars the product recall costs Hillside seeks to recover. The recall of the products by Hillside, and, more specifically, by the beverage companies, was a general one, extending to all of the beverages that bore Hillside's plant code without regard to whether they were actually contaminated or not. It thus falls squarely within the sistership concept and the exclusion, which is unambiguous, applies.

387 N.J.Super. 224, 239-240, (App. Div. 2006)(citations omitted). Moreover, "[t]he essential focus of this clause limits coverage by excluding the cost of recalling apparently undamaged products to search for damaged components otherwise not yet discovered." Id.

Thus, it is clear that exclusion "n" does not apply to these facts. Since any recall took place here was not a general one, but one exclusively comprised of the allegedly contaminated product, there is no allegation of damages for extraneous recall costs for the court to exclude.

Only exclusion "k" presents an issue which cannot be resolved by examining the face of the policy: whether IFF's vanilla extract was damaged separately and as a separate product so as to avoid exclusion from coverage under this provision. Travelers argues that IFF's product–the vanilla extract–is so closely related to Dammann's product that the alleged physical damage to it is excluded from coverage. Dammann asserts that this exclusion does not apply to the IFF

allegations because the damages alleged are not to Dammann's own product, but to IFF's vanilla extract, machinery.  (Def.'s Br. at 20).

Exclusions in an insurance policy should be narrowly construed. Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 698 A.2d 9 (1997).  The insurer has the burden of bringing the claim within the exclusion.  Colliers Lanard & Axilbund v. Lloyds of London, 458 F. 3d 231, 236 (3d Cir. 2006).  Nonetheless, "exclusions are presumptively valid and will be given effect if 'specific plain, clear, prominent, and not contrary to public policy.'" Id.  New Jersey courts also "endeavor to interpret insurance contracts to accord with the objectively reasonable expectations of the insured."  Id.

When interpreting policies like those in the case at bar, New Jersey courts have held that exclusionary provisions only apply to claims for damage to the insured's own work arising out of his faulty workmanship, and not to damage to other property not manufactured or provided by the insured, yet caused by the insured's poor performance.  Hartford Ins. Group v. Marson Construction Corp., 186 N.J.Super. 253, 258-59, 452 A.2d 473 (App.Div.1982), cert. denied, 93 N.J. 247, 460 A.2d 656 (1983).  The exclusionary provisions do not apply "to damages for loss or destruction of the buyer's products when such loss is due to a defect in the insured's product later incorporated into the buyer's product."  See also Marine Midland Ser. v. Samuel Kosoff Inc., 60 App.Div.2d 767, 400 N.Y.S.2d 959 (App.Div.1977) (holding that the exclusions did not apply to claims involving a defective roof reducing the value of a completed building); International Hormones, Inc. v. Safeco Ins. Co. of America, 57 App.Div.2d 857, 394 N.Y.S.2d 260 (App.Div.1977) (holding that the exclusions were inapplicable where defective hormone

17

suspensions incorporated in other chemical solutions rendered the solutions defective); Thomas

J. Lipton, Inc. v. Liberty Mut. Ins. Co., 34 N.Y.2d 356 (Ct. App. 1974) (holding that the

exclusions did not apply where defective noodles used to produce soup rendered the soup

defective).

In this case, the damage is to IFF's product--the vanilla extract–and not to any product

produced by Dammann.  Although Dammann's product–the vanilla beans–provides an important

ingredient for IFF's product, IFF's product is distinct for these purposes, and the exclusions do

not apply.

In any event, IFF's alleged property damage was not limited to the vanilla extract, and

also included damage to IFF's equipment.  IFF's equipment is certainly separate and distinct

third-party property, which, if damaged as a result of Dammann's faulty workmanship, is covered

under the provisions of the Policies.

3. Loss of Use

In opposition to the motion, Dammann also raises IFF's allegations regarding the

shutdown of its operation following the mercury contamination, and the "loss of use" associated

with its product in general.  The Claim Letter alleges:

> IFF's vanilla production operation was shut down.  The equipment was
> thoroughly cleaned and then swabbed to conduct testing to insure all possible
> cross contamination would be avoided.

(Id. at 2.)  In addition, the Claim Letter seeks damages specifically for costs associated with

18

"[r]emediation/cleaning, [c]ustomer [s]ervice impact, and other categories which all arguably refer to "loss of use" which is included in the definition of "property damage" set forth by the Policies.

      The Court of Appeals has interpreted "loss of use" in this context, explaining that the amended definition of "property damage" added the "loss of use" language and allowed for coverage for both physical and non-physical injuries.  Lucker Mfg., A Unit of Amclyde Engineered Prods., Inc. v. Home Ins. Co., 23 F. 3d 808, 815 (3d Cir. 1994).  The court declared that "the loss of use definition covered not only the lost physical use of the tangible property, but also the non-physical use of the product, such as offering it for sale and the decreased value of a product because of loss of customer acceptance for the product . . ."  Id. at 816.  The court determined that both the purposes behind liability insurance and the case law interpreting liability insurance suggest that the loss of a non-physical use of a product, such as offering it for sale, should be considered loss of use.  Id. at 821.

      Dammann argues correctly that the shutdown of the machinery used to process the vanilla extract constituted "loss of use" under Lucker, but the contamination of vanilla extract itself also caused a "loss of use."  In Elizabethtown Water Co. v. Hartford Cas. Ins. Co., this court, in applying the Lucker interpretation, determined that a third-party real estate developer, affected by the insured's failure to supply water to a new housing development as agreed, had incurred a "loss of use" vis-a-vis delayed or lost home sales.  998 F. Supp. 447 (D.N.J. 1998).  Similarly, here, Dammann's failure to supply palatable vanilla beans caused tangible and intangible damage to IFF's property in the form of "loss of use" which is not excludable under the Policies.

Travelers does not directly address the matter of IFF's cleaning and remediation of its own facilities, and whether they constitute allegations of "property damage," either as physical injury or "loss of use," under the Policies.   The court finds that they do constitute "property damage" for these purposes, and by themselves probably prevent the court from granting Travelers's motion for summary judgment.

Summary judgment must be denied because it appears that, as a matter of law, claims which might be brought against Dammann may be covered by the Policies.

**B.  Timing of Summary Judgment Motion**

Dammann contends that the summary judgment motion is premature because it has not been able to take all of the discovery it requires to adequately oppose the motion.

Federal Rule 56(f) states that "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for [summary] judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Fed. R. Civ. P. 56(f).

In this case, the evidence presented is adequate for the court to fully consider the merits of the motion for summary judgment, and, as the motion will be decided in favor of Dammann, the matter of the additional discovery is moot and needs not be further considered.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Travelers's motion for summary judgment will be denied.

The court will enter an order implementing this opinion.

/s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:        February 11, 2008

21