**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

------------------------------------------------------

| | | |
|---|---|---|
| THE TRAVELERS INDEMNITY COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civ. No. 04-5699 (DRD) |
| v. | : | |
| | : | |
| DAMMANN & CO., INC. and INTERNATIONAL FLAVORS & FRAGRANCES, INC., | : | **O P I N I O N** |
| | : | |
| Defendants. | : | |

------------------------------------------------------

| | | |
|---|---|---|
| DAMMANN & CO., INC., | : | |
| | : | |
| Defendant/ Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COOPERATIVE BUSINESS INTERNATIONAL, INC., and NATIONWIDE MUTUAL INSURANCE COMPANY, | : | |
| | : | |
| Third-Party Defendants. | : | |

------------------------------------------------------

BOROWSKY & BOROWSKY, LLC
Frank E. Borowsky, Jr., Esq.

1

Michael J. Frantz, Jr., Esq.
59 Avenue at the Common
Suites 101 & 102
Shrewsbury, NJ 07702

*Attorneys for Plaintiff*


DAY PITNEY LLP
Robert G. Rose, Esq.
P.O. Box 1945
Morristown, NJ 07962-1945

*Attorneys for Defendant International Flavors & Fragrances, Inc.*


ANDERSON KILL & OLICK, P.C.
Eugene R. Anderson, Esq.
Steven J. Pudell, Esq.
Natasha Z. Millman, Esq.
One Gateway Center, Suite 1510
Newark, NJ 07102

ANDERSON KILL & OLICK, P.C.
Rhonda D. Orin, Esq.
2100 M Street N.W.
Washington, DC 20037

LEARY BRIDE TINKER & MORAN, P.C.
Peter M. Bouton, Esq.
7 Ridgedale Avenue
Cedar Knolls, NJ 07927

*Attorneys for Defendant and Third-party Plaintiff Dammann & Co., Inc.*


PRUTTING & LOMBARDI
George A. Prutting, Jr., Esq.
701 South White Horse Pike
Audubon, NJ 08106

*Attorneys for Third-party Defendant Cooperative Business, International, Inc.*

2

**DEBEVOISE, Senior District Judge**

Plaintiff, The Travelers Indemnity Company ("Travelers"), filed a complaint on November 17, 2004 seeking a declaration of non-liability under two insurance policies that it issued to defendant, Dammann & Co., Inc. ("Dammann").  Dammann filed a counterclaim seeking a declaration that Travelers is obligated to provide coverage related to the claims of International Flavors & Fragrances, Inc.("IFF"), and brought additional counterclaims for breach of contract, breach of fiduciary duty, and breach of the duty of good faith and fair dealing. Dammann then commenced a third-party claim for indemnity against Cooperative Business International, Inc. ("CBI") and CBI's liability insurance company, Nationwide Mutual Insurance Company ("Nationwide").

On February 8, 2008, IFF filed a notice of motion for leave to file cross-claims against its co-defendant, Dammann, for the losses IFF sustained as a result of the fact that several shipments of vanilla beans sold by Dammann to IFF were tainted with mercury.  IFF claimed damages totaling $5,189,924.  Magistrate Judge Shipp denied IFF's motion in an order dated August 13, 2008 (hereafter, "Judge Shipp's Order").  On August 22, 2008, IFF filed an appeal of Judge Shipp's Order, pursuant to Local Rule 72.1(c)(1).  Dammann and CBI opposed IFF's motion. On September 29, 2008, concurrent with its reply brief in support of its appeal of Judge Shipp's Order, IFF filed a second, separate motion "in further support of its appeal" of Judge Shipp's Order and for leave to file an amended and supplemental cross-claim.  Dammann, CBI and Travelers opposed this second motion.  For the reasons set forth below, both of IFF's motions will be denied.

3

# I. BACKGROUND

Dammann produces raw foods, including vanilla beans, and distributes them to processed food manufacturers who pass the products on, in various reincarnations, for consumption.  IFF manufacturers food flavorings, including vanilla extract.  Dammann and IFF entered into a contract (the "Contract") pursuant to which Dammann agreed to deliver vanilla beans to IFF.  On or about March 29, 2004, IFF discovered that certain lots of Indonesian vanilla beans supplied to it between January 14 and 30, 2004 by Dammann may have been contaminated with mercury.  Thereafter, IFF sent a letter enumerating its claims for damages against Dammann for the alleged failure to deliver vanilla beans that conformed to the Contract.

 In a letter to the Recall Coordinator of the Food & Drug Administration (FDA), dated April 2, 2004, counsel for IFF indicated that IFF had discovered that two lots of Indonesian vanilla beans that it had received were contaminated with mercury.  Shortly thereafter, in a letter dated April 5, 2004, IFF informed Dammann of its alleged discovery of mercury contamination in the vanilla beans, and its conclusion that the contamination was caused by injections of mercury by Indonesian farmers seeking to boost the weight of crop yields.  By a letter dated May 25, 2004, from IFF to Dammann, IFF set forth a claim for damages totaling $5,189,924, allegedly caused by the mercury contamination of the vanilla beans.

Dammann filed an insurance claim with Travelers, which Travelers denied.  Apparently in anticipation of actions against it by Dammann and IFF, Travelers commenced this suit on November 17, 2004, seeking a declaration of non-liability for IFF's claims under the insurance policies Dammann held with Travelers.  Dammann filed a counterclaim seeking a declaration that Travelers was obliged to provide coverage on IFF's claims against Dammann, and brought

additional counterclaims for breach of contract, breach of fiduciary duty, and breach of the duty

of good faith and fair dealing.  Travelers filed a motion for summary judgment, on June 1, 2007,

seeking a declaration of no coverage.  On February 11, 2008, this court denied that motion and

held that IFF's property damage claims "are covered by [the Commercial General Liability

policy]" (Slip Op. at 14) and that IFF's loss of use claims "may be covered by the Policies."

(Slip Op. at 20.)

Dammann and Travelers executed a settlement agreement, on September 16 and 18,

2008, which settled all claims by Travelers against Dammann and all counterclaims by

Dammann against Travelers.  (See Stipulation and Order of Dismissal dated Oct. 20, 2008 (Doc.

No. 119) and Letter from Michael Frantz, Jr. dated Nov. 24, 2008 attaching signature pages of

the settlement agreement (Doc. No. 126).)

## A.      IFF's First Motion

Through its first motion, IFF appeals Judge Shipp's Order denying IFF leave to amend its

answer to assert a products liability cross-claim against Dammann.  IFF seeks to assert a claim

against Dammann for the economic losses IFF sustained from the adulterated vanilla beans,

including the damages to its vanilla extract, other food flavors and the manufacturing equipment

that was contaminated in the extraction process.  IFF claims damages totaling $5,189,924.00.

IFF's original motion for leave to amend its answer, filed on February 8, 2008, included

cross-claims against Dammann for (1) breach of express warranty, (2) breach of implied

warranty, and (3) products liability.  In its reply brief, however, IFF stated that "[b]ecause

virtually all of the vanilla beans delivered by Dammann have been processed by IFF into vanilla

extract and other food products, IFF makes no claim for damages related to any non-processed

vanilla beans," and that it was "agreeable" to the withdrawal of the warranty claims.[1]  (Def.'s Motion to Amend (Doc. No. 77) at 2.)

Judge Shipp's Order denied IFF leave to assert the products liability cross-claim based upon a finding that the proposed claim was subject to the four-year statute of limitations in the relevant portion of the Uniform Commercial Code ("U.C.C.") and that, because the statute of limitations had run on IFF's claim, the proposed amendment would not survive a motion to dismiss.  (Aug. 13, 2008 Slip Op. at 3 (citing Doe v. Div. of Youth & Family Servs., 148 F. Supp. 2d 462 (D.N.J. 2001).)  Because IFF filed its motion for leave to file a cross-claim on February 8, 2008 – less than four years after IFF discovered the defect in the beans but more than four years after receiving the beans – Judge Shipp first determined whether the cause of action accrued when the beans were accepted or when the defect was discovered.  As Judge Shipp noted, the U.C.C. states, in relevant part:

> [A] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.J. Stat. Ann. 12A:2-725.  Judge Shipp held that there was no explicit warranty of future performance in the contract between Dammann and IFF:

> The Memorandum of Agreement . . . states, "Seller guarantees that all chemical substances or mixtures of chemical substances sold to IFF

---

[1] The parties dispute whether IFF's statement was sufficient to withdraw its warranty claims, as IFF made no formal motion to withdraw the claims.  Whether or not IFF actually withdrew these claims, however, does not affect the court's determination on these motions so will not be discussed.

> hereunder comply with the Federal Toxic Substances Control Act."
> IFF has not claimed that the mercury content of the beans violated the
> Federal Toxic Substances Control Act.   Indeed, the FDA, after
> receiving information concerning the mercury content of the beans,
> stated that the mercury content was not high enough to pose a health
> risk.   As there was no explicit warranty of future performance, this
> Court finds that the cause of action accrued when delivery was
> tendered in January 2004, not when the defect in the beans was
> discovered in February 2004.

(Aug. 13, 2008 Slip Op. at 4 (internal citations omitted).)  Thus, because IFF did not seek leave

to file its cross-claim until more than four years after the delivery of the beans, Judge Shipp held

that the statute of limitations had run on the claim.  (Id.)

Judge Shipp also addressed IFF's argument that tort law preempts the U.C.C. in this

situation.  IFF contends that the New Jersey Product Liability Act ("NJPLA"), which entitles a

claimant to damages against a manufacturer or seller of a product as a result of harm caused by a

product which is "not reasonably fit, suitable or safe for its intended purpose," applies to its

proposed cross-claim.  N.J. Stat. Ann. 2A:58C-2.  Under the NJPLA, "harm" is defined as

"physical damage to property, other than the product itself."  Id. at 1(b)(2).  The statute of

limitations for such a tort claim is six years.  N.J. Stat. Ann. 2A:14-1.  Judge Shipp held that:

> IFF bases its claim to damages under the NJPLA on its assertion that
> it is not seeking a remedy for the defective product itself, but for
> damages to IFF's other products which were rendered unmarketable
> by the incorporation of the adulterated beans.  However, it is settled
> law in New Jersey that in the case of a buyer seeking damages for
> economic loss resulting from defective goods, the UCC preempts tort
> principles.  Spring Motors Distributors, Inc. v. Ford Motor Co., 98
> N.J. 555, 579 (1985) . . . .  Therefore, while IFF is entitled to
> economic damages consequential to the breach of contract, they are
> limited to what they are entitled to under the UCC, not under NJPLA.

(Aug. 13, 2008 Slip Op. at 6.)  Judge Shipp also briefly addressed IFF's delay in bringing this cause of action, finding that it had "little excuse" for its delay because it knew of the presence of mercury in the beans on March 29, 2004, and knew that Dammann refused to honor IFF's claim for damages incurred as a result of the contaminated beans by the time that Travelers filed suit for a declaration of non-liability against Dammann in November 2004.  (Id. at 6.)

**B.**      **IFF's Second Motion**

If the court determines that IFF does not state a cognizable products liability claim and thus denies IFF's first motion, IFF seeks, through its second motion – the "further support" of its appeal of Judge Shipp's Order and the motion for leave to file an amended and supplemental cross-claim – to amend its answer to assert the following cross-claims against Dammann: (1) breach of express warranty of future performance; (2) breach of implied warranty of merchantability and fitness; (3) express indemnification; and (4) implied common law indemnification.

## II.  DISCUSSION

**A.**      **IFF's First Motion**

*i.*      ***Standard of Review  – Appeal of a Magistrate Judge's Decision***

A magistrate judge's decision may be overturned only when the ruling was clearly erroneous or contrary to law.  L. Civ. R. 72.1(c)(1)(A).[2]  "The party filing the notice of appeal bears the burden of demonstrating that the magistrate judge's decision was clearly erroneous or

---

[2]  L. Civ. R. 72.1(c)(l)(A) states:  "Any party may appeal from a Magistrate Judge's determination of a non-dispositive matter within 10 days after the party has been served with a copy of the Magistrate Judge's order . . . . A Judge shall consider the appeal and/or cross-appeal and set aside any portion of the Magistrate Judge's order found to be clearly erroneous or contrary to law."

contrary to law." Marks v. Struble, 347 F. Supp. 2d 136, 149 (D.N.J. 2004) (quoting Cardona v.

Gen. Motors Corp., 942 F. Supp. 968, 971 (D.N.J. 1996)(internal quotations omitted)). A

finding is clearly erroneous "when although there is evidence to support it, the reviewing court

on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 131 F.R.D. 63, 65 (D.N.J.

1990) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)(internal quotations

omitted)). A ruling is contrary to law if the magistrate judge has misinterpreted or misapplied

applicable law. Gunter v. Ridgewood Energy Corp., 32 F. Supp. 2d 162, 164 (D.N.J. 1998).

### ii.   IFF's Products Liability Claim

IFF contends that its products liability claim sounds in tort and is thus subject to the six-

year statute of limitations for tort claims. IFF argues that Judge Shipp's Order was clearly

erroneous or contrary to law because Judge Shipp held that the claim, under the economic loss

doctrine, is governed by the U.C.C. and is therefore subject to its four-year statute of limitations.

### a.   The Economic Loss Doctrine

The Supreme Court of New Jersey first recognized the economic loss doctrine in Spring

Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 561 (1985). Under New Jersey law, "a

commercial buyer seeking damages for economic loss resulting from the purchase of defective

goods may recover from an immediate seller and a remote supplier in a distributive chain for

breach of warranty under the U.C.C., but not in strict liability or negligence." Id. In Spring

Motors, the plaintiff, a corporation that sold and leased trucks, alleged that defects in the

transmissions that were installed in commercial trucks caused it to sustain consequential damages

and to lose the benefit of the bargain. The defendants were a motor vehicle manufacturer, its

9

dealer, and a supplier of transmissions.  The plaintiff sought recovery for repair, towing, replacement parts, lost profits, and a decrease in the value of the trucks.

The Spring Motors Court explained that the purpose of the U.C.C. is to provide "a comprehensive system for determining the rights and duties of buyers and sellers with respect to contracts for the sale of goods," and to "make uniform throughout the United States the law governing commercial transactions."  Id. at 565.  The Court also explained the appropriate measure of damages under the U.C.C.:

> When a seller delivers goods that are not as warranted, the buyer's measure of damage is the difference between the value of the defective goods and the value they would have had if they had been as warranted.  N.J.S.A. 12A:2-714.  In a proper case, a buyer may also recover incidental damages, which include reasonable expenses incidental to the breach, N.J.S.A. 12A:2-715; consequential damages, including losses resulting from the buyer's particular needs of which the seller had knowledge, id. at (2)(a); and property damage, id. at (2)(b).
>
> Economic loss can take the form of either direct or consequential damages.  A direct economic loss includes the loss of the benefit of the bargain, i.e., the difference between the value of the product as represented and its value in its defective condition.  Consequential economic loss includes such indirect losses as lost profits.

Spring Motors, 98 N.J. at 566.  The Court concluded that "the U.C.C. is the more appropriate vehicle for resolving commercial disputes arising out of business transactions between persons in a distributive chain," id. at 571, and "that a commercial buyer seeking damages for economic loss only should proceed under the U.C.C. against parties in the chain of distribution," id. at 578.

**b.    The NJPLA**

IFF contends that Judge Shipp's Order was incorrect in stating that "it is settled law in New Jersey that in the case of a buyer seeking damages for economic loss resulting from

10

defective goods, the U.C.C. preempts tort principles." (Aug. 13, 2008 Slip Op. at 6.) Rather, IFF

argues that the NJPLA controls because the NJPLA allows for recovery for "physical damage to

property, other than the product itself." N.J. Stat. Ann. 2A:58C-1. IFF contends that "the injury

here occurred not to the adulterated vanilla beans themselves, but to other products (i.e., the

vanilla extract and other flavors which incorporated vanilla extract or other flavoring derived

from the adulterated vanilla beans)." (Def.'s Appeal (Doc. No. 98-2) at 5.) IFF explains its

position:

> IFF's vanilla extract is produced from vanilla beans through a
> percolation process using a water and alcohol solution that is passed
> through a series of baskets that contain crushed beans. As a regulated
> food product under the FDA, pure vanilla extract is required to
> contain 13.35 ounces of vanilla beans per gallon of liquid and not less
> than a 35% ethyl alcohol content by volume. 21 C.F.R. §§ 169.175
> & 169.176 (2008). Accordingly, vanilla extract and other food
> flavors are not simply a liquified form of the vanilla beans. Instead,
> the beans are processed and combined with other ingredients to
> produce wholly separate flavor products that are then sold to IFF's
> customers as ingredients in their consumer food products.

(Def.'s Reply Br. (Doc. No. 108) at 12.)

Thus, the essential inquiry in determining whether IFF's claim sounds in tort under the

NJPLA or in contract under the U.C.C. is whether the damage claimed by IFF was "physical

damage to property, other than to the product itself," or was damage "to the product itself." The

Supreme Court of New Jersey has not yet interpreted the phrase "physical damage to property,

other than to the product itself" as it is used in the NJPLA, so this court must predict how the

New Jersey Supreme Court would rule if faced with the issue. British Ins. Co. of Cayman v.

Safety Nat'l Cas., 335 F.3d 205, 211 (3d Cir. 2003).

11

c.       Damage "Other than to the Product Itself"

As discussed above, New Jersey adopted the economic loss doctrine in Spring Motors, 98

N.J. at 561.  The State's Supreme Court also addressed the issue in Alloway v. General Marine

Industries, L.P., 149 N.J. 620 (1997), where it extended the holding of Spring Motors to

transactions in goods involving non-commercial buyers.  149 N.J. at 641.  The Alloway Court

further clarified the intersection of contract and tort principles:  "Tort principles more adequately

address the creation of an unreasonable risk of harm when a person or other property sustains

accidental or unexpected injury.  When, however, a product fails to fulfill a purchaser's

economic expectations, contract principles, particularly as implemented by the U.C.C., provide a

more appropriate analytical framework."  Id. at 628.  In Alloway, there was no allegation of

damage to property other than the product itself, so the Court did not address the issue.  Id. at

639.

The decision of the Court of Appeals for the Third Circuit in In re Merritt Logan, 901

F.2d 349 (3d Cir. 1990), is instructive.  In that case, the buyer of a defective refrigeration system

sued the manufacturer, the installer, and the seller of the system.  The plaintiff's claims included

a tort claim for damage to the food that spoiled when the refrigeration system failed.  The Court

of Appeals held that because the "damage to Merritt Logan's food stocks occurred at the core of

the commercial transaction," a tort claim was not permissible.[3]  Id. at 362.  The Court explained

that, "in the context of actions between parties to contracts for the sale of goods," it believed that

---

[3] IFF's argument that Merritt Logan is a "component part" case (Def.'s Reply Br. (Doc. No. 108) at 7-8) where "the product damaged was the 'product itself,'" is a misstatement of the facts of this case, as the product here was a refrigeration system and the claimed damage was to spoiled food – unquestionably property other than the product itself.

the New Jersey Supreme Court would reject a limitation of the economic loss doctrine that would allow a tort claim for the spoiled food stocks "in favor of the U.C.C. rule permitting consequential damages, including direct economic damage to other property, unless the parties' contract of sale excludes consequential damages." Id. at 363.  Similarly, IFF's claims for damages in this action are for damages alleged to have occurred at the core of the commercial transaction with Dammann, i.e., damages from tainted vanilla beans.

The decision of the Court of Appeals in Paramount Aviation Corp. v. Augusta, 288 F.3d 67 (3d Cir. 2002), although involving a different relationship among the parties, is also instructive.  In Paramount, the plaintiff was neither a purchaser within the distribution chain nor a member of the limited class of parties outside the distribution chain who could be considered third party beneficiaries of the transactions among the parties in the chain.  Thus, that plaintiff was not in a position "to engage in the risk allocation contemplated by the U.C.C." and was not prohibited by Spring Motors and Alloway from asserting its strict liability claim.  Id. at 73.  The Court reiterated, however, that "as far as parties (whether commercial or non-commercial) within the distribution chain of goods are concerned, the U.C.C. alone controls the liability of a seller of goods for economic loss arising as a result of a defect in those goods; there is, accordingly, no liability in a tort action whether it be one asserting strict liability or negligence." Id. (emphasis added).  Here, IFF was a party within the distribution chain and was in a position "to engage in the risk allocation contemplated by the U.C.C." through its negotiation of the terms of the Contract with Dammann.

The Court of Appeals has also recently addressed the economic loss doctrine in a case where Kentucky state law applied.  In Reyton Cedar Knoll, LLC v. HPG International Inc., No.

13

07-2955, 2008 WL 3823922 (3d Cir. Aug. 18, 2008), the plaintiff purchased a mall and, a month later, the roof shattered.  As a result of the property loss, the plaintiff sued the company that had supplied the roof membrane, alleging negligence and strict liability.  The plaintiff argued that the roof is the "product" and therefore the plaintiff is entitled to recover for damage to the interior of the mall (i.e., damage to property other than the product itself).  Id. at *1.  The Court of Appeals noted that "a majority of jurisdictions and the weight of the academic community favor application of the economic loss doctrine to business purchases."  Id. (citing Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 484-49 (6th Cir. 2002)).  Because the plaintiff contracted for the entire mall and could have allocated the risk in that contract, the Court further held that the entire mall was the "product" for purposes of the economic loss doctrine and that recovery in tort for damage to the mall was thus barred by the doctrine.  Id. at *2.

The Court of Appeals for the Fourth Circuit also recently addressed a situation where a party asserted a tort claim, alleging damage to "other property," in a case otherwise governed by the U.C.C.  In Palmetto Linen Service, Inc. v. U.N.X., Inc., 205 F.3d 126 (4th Cir. 2000), the plaintiff had purchased commercial washers from the defendant and sought damages for the destruction of its linens caused by a defective chemical dispensing system in the washers.  Among other claims, the plaintiff asserted a tort claim, arguing that the linens were "other property" for purposes of the economic loss doctrine.  The Fourth Circuit explained:

> Although the economic loss rule generally does not apply where other property damage is proven, courts have tended to focus on the circumstances and context giving rise to the injury in determining whether alleged losses qualify as "other property" damage. Specifically, in the context of a commercial transaction between sophisticated parties, injury to other property is not actionable in tort if the injury was or should have been reasonably contemplated by the parties to the contract.  In such cases the failure of the product to

14

perform as expected will necessarily cause damage to other property, rendering the other property damage inseparable from the defect in the product itself.

Id. at 129-130 (internal citations and quotations omitted).  The Fourth Circuit held that the economic loss doctrine precluded recovery in tort for "other property damage where such damage was foreseeable and inseparable from the alleged product defect," and that "[t]he parties to the contract either contemplated or should have contemplated these dangers in allocating the risk of loss."  Id. at 130.  Similarly, contamination of the vanilla beans, and the effect of such contamination on the vanilla extract, was foreseeable and IFF could have contemplated that danger in allocating the risk of loss under the Contract.

The cases above support a finding that IFF may not pursue a tort claim under the NJPLA for the damage resulting from the contaminated vanilla beans.  Spring Motors and Alloway make clear that claims arising out of transactions for goods among parties in the distribution chain sound in contract under the U.C.C., particularly where the damage is foreseeable, and thus the risk for such damage could have been allocated by the parties in the contract, and where the damage occurs at the core of the commercial contract.  At least one other recent decision in this District has come to the same conclusion on similar facts.  In International Flavors & Fragrances, Inc. v. McCormick & Co., Inc., 575 F. Supp. 2d 654 (D.N.J. 2008), IFF purchased paprika from the defendant and later discovered that the paprika was infested with cigarette beetles.  Before discovery of the infestation, IFF had already used some of the paprika powder in barbeque seasoning.  IFF claimed that "the defective paprika damaged the barbeque seasoning into which the paprika was ultimately incorporated, and this damage 'is in the nature of a tort.'"  Id. at 656.  As in this case, IFF alleged that its claims regarding damage from the tainted paprika were tort

15

claims under the NJPLA and the court had to predict how the New Jersey Supreme Court would interpret the phrase "physical damage to property, other than to the product itself" as used in N.J. Stat. Ann. 2A:58C-1(b)(2).  The court held that the damage to the barbeque seasoning was not damage to property "other than the product itself" and that the claims sounded in contract under the U.C.C. because (1) contract principles as implemented by the U.C.C. are the appropriate analytical framework when a product fails to fulfill a purchaser's economic expectations; (2) damage that occurs at the core of a commercial transaction is not permitted as a tort claim; (3) injury to other property in the context of a commercial transaction between sophisticated parties is not actionable in tort if it was or should have been reasonably contemplated by the parties; and (4) damage to a final product by a defective component or ingredient is foreseeable and sophisticated parties are capable of protecting themselves from such in a contracting process.  Id. at 659-63.  The court concluded that "if IFF's position were to prevail, 'contract law would drown in a sea of tort.'" Id. at 663 (quoting E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866 (1986)).

For the foregoing reasons, this court holds that Judge Shipp's Order was not clearly erroneous or contrary to law and is hereby affirmed.

**B.      IFF's Second Motion**

*i.        Standard of Review – Motion to Amend*

Federal Rule of Civil Procedure 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires."  Leave to amend shall be freely given in the absence of undue delay, undue prejudice to the opposing party, futility of the amendment, bad faith or dilatory motive on the part of the movant, or the movant's repeated failure to cure deficiencies in

previous amendments.  Foman v. Davis, 371 U.S. 178, 182 (1962); Long v. Wilson, 393 F.3d 390, 400 (3d Cir. 2004) .

In determining the futility of an amendment, the court "applies the same standard of legal sufficiency as applies under Rule 12(b)(6)."  MedPointe Healthcare, Inc. v. Hi-Tech Pharmacal Co., Inc., 380 F. Supp. 2d 457, 462 (D.N.J. 2005) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d. Cir.1997)).  The court must accept as true all factual allegations contained in the proposed amended complaint and any reasonable inferences that can be drawn from them.  Brown v. Phillip Morris, Inc., 250 F.3d 789, 796 (3d Cir. 2001) (citing Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993)).  The factual allegations must be enough, when taken as true, to state a claim for relief that is plausible on its face.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).

### ii.    Breach of Express Warranty

IFF seeks to assert a cross-claim against Dammann for Breach of Express Warranty (Count One).  IFF alleges that the Contract contains a warranty of future performance under N.J. Stat. Ann. 12A:2-725(2).  Under New Jersey law, the statute of limitations for a breach of warranty is four years and accrues when the breach occurs.  N.J. Stat. Ann. 12A:2-725.  "A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."  Id. at 2-725(2).

Under New Jersey law, "[t]he key requirement in finding a warranty of future performance is that it makes specific reference to a future time period."  Comm'rs of Fire Dist.

17

No. 9 v. American La France, 176 N.J. Super. 566, 573 (App. Div. 1980); Docteroff v. Barra

Corp. of Am., Inc., 282 N.J. Super. 230, 241-42 (App. Div. 1995)(quoting Fire Dist. No. 9).  For

example, a guarantee to maintain the roof of a structure "in a watertight condition" for five years

is considered a warranty of future performance under New Jersey law.  Docteroff, 282 N.J.

Super. at 242.  "However, a mere reference to 'the future' is inadequate to create a warranty

extending to future performance."  George Campbell Painting, Corp. v. Tennant Co., Civ. No.

94-4498, 1995 WL 224410, at *4 (D.N.J. April 7, 1995).  A  warranty of future performance

"cannot be characterized as a mere representation of the product's condition at the time of

delivery rather than its performance at a future time.  Additionally, unlike a warranty to repair or

replace, such warranty does not assume that the product will not perform and will need repair or

replacement."  Docteroff, 282 N.J. Super at 242 (quoting Fire Dist. No. 9, 176 N.J. Super. at

573).

 IFF contends that the warranty of future performance is in Appendix A to the Contract:

> Seller guarantees that all goods sold to IFF hereunder will not, as of
> the date of delivery, bear or contain pesticides, radiation or
> radioactive contaminants, at levels considered unsafe by United
> States or International Standards or inappropriate for IFF's intended
> use.  This guarantee shall survive acceptance of delivery with or
> without inspection for pesticides or radiation.  Seller guarantees that
> all chemical substances or mixtures of chemical substances sold to
> IFF hereunder comply with the Federal Toxic Substances Control
> Act. The whole sound pods of vanilla plantfolia Andrews which [sic]
> have been properly cured to fully develop the typical vanilla flavor
> and aroma.  They shall not have undergone any treatment which
> would alter the natural vanilla content or any other flavoring
> constituent nor have undergone any treatment intended to have a
> preservative effect on the beans.

IFF alleges that "[b]y its very nature, the survival of acceptance provision contained in the

Agreement constitutes a guarantee of future performance."  (Doc. No. 109-2 at 9.)  Under New

18

Jersey law, however, this survival of acceptance provision is not sufficient to create a guarantee of future performance.  As explained in Fire District No. 9, a warranty of future performance requires a specific reference to a future time period, and this paragraph does not contain such a reference.  Further, even if the sentence, "This guarantee shall survive acceptance of delivery with or without inspection for pesticides or radiation," is considered to be a guarantee of future performance, in the context of the paragraph above this guarantee of future performance would relate only to the guarantee of the previous sentence – that the goods will not contain pesticides, radiation, or radioactive contaminants.  The mercury in the adulterated vanilla beans does not fall within this category, and, thus, the mercury contamination would not be included in this guarantee of future performance.

IFF claims that this interpretation of Appendix A "would render the survival clause meaningless and would defeat its intended purpose – to permit the analytical laboratory testing of raw food ingredients after their delivery to insure their compliance with FDA regulations" and prevent the sale of adulterated food to the public.  (Def.'s Reply Br. (Doc. No. 124) at 7.)  IFF points out, correctly, that the only way mercury could have been detected was by laboratory testing following the delivery of the vanilla beans.  This testing, however, can be done in a matter of weeks – as evidenced by the fact that IFF received test results on March 29, 2004, approximately two months after delivery of the beans, and in plenty of time to file suit before January 2008.  Indeed, as IFF notes, "because of the perishable nature of the vanilla beans, testing necessarily would have to take place within a limited time period following their delivery."  (Id. at 2.)  The Contract, however, does not include a specific time period for testing that could be construed as a warranty of future performance, and there is nothing in the language

19

of Appendix A to indicate that the parties intended to include a warranty of future performance such that the statute of limitations would not accrue until the discovery of this sort of contamination.

IFF's motion for leave to file an amended cross-claim for breach of express warranty is denied based on the futility of the amendment; the claim is barred by the statute of limitations, and thus would not survive a motion to dismiss.

### iii.    *Breach of Implied Warranty*

IFF seeks to assert a cross-claim against Dammann for Breach of Implied Warranty (Count Two). Implied warranties, by their very nature, cannot extend to future performance because such an extension must be <u>explicit</u> and an implied warranty cannot explicitly state anything. See Cardinal Health 301, Inc. v. Tyco Elecs. Corp., Civ. No. D049623, 2008 WL 5206399, at *11 (Cal. App. Dec. 15, 2008) ("Because an implied warranty is one that arises by operation of law rather than by an express agreement of the parties, courts have consistently held it is not a warranty that 'explicitly extends to future performance of the goods . . . .'" (citing U.C.C. § 2-725 (2)) and collecting cases)). Thus, for the same reasons that IFF's claim for breach of express warranty is time barred, this claim is also time barred and IFF's motion for leave to file it is denied.

### iv.    *Express Contractual Indemnity*

IFF seeks to assert a cross-claim against Dammann for Express Indemnification (Count Four). IFF alleges that the following two paragraphs of the Contract are the basis for this cross-claim:

> REWORK AND PRODUCT LIABILITY INDEMNIFICATION: In
> the event of any failure or defect in the product produced hereunder

20

resulting from Seller's failure to comply with the terms of this Agreement, including but no limited to failure to meet Buyer's specifications, Seller agrees (upon Buyer's request) to replace, rework and/or scrap any defective product or authorize Buyer to do so at Seller's expense and Seller shall assume responsibility for Buyer's total finished product-related costs including an [sic] production, raw materials, packaging materials and freight costs incurred by Buyer and the cost of inspecting, recovering, sorting, reworking and scrapping such project.  In addition, Seller shall be responsible for claims by third parties against Buyer for loss or damage based on personal injury or destruction of property due to defects in the product for which Seller is responsible.  Seller shall be responsible for the defense, settlement or other final disposition of such claims and agrees to hold Buyer harmless from an expenses or liability arising out of such claims.  Buyer may, as its option and expense, retain counsel to participate in the investigation and handling of such claims.  Seller is liable for any damage to Buyer's stocks, equipment and goods caused by incorrect or insufficient product description of Seller's goods.

PERSONAL INJURY AND PROPERTY DAMAGE LIABILITY INDEMNIFICATION:  Buyer has been informed by the Seller of those health and safety hazards known to Buyer associated with the processing and handling of any raw materials furnished by Buyer in order to product [sic] products sold by Seller hereunder.  Seller assumes sole responsibility for taking all necessary health and safety precautions, including compliance with all applicable local, state, provincial and federal regulations, in producing product(s) under this Agreement provided Buyer has informed Seller of all known health and safety hazards as required above.  These precautions shall include, but not be limited to, such things as proper control of ventilation, the wearing of adequate protective clothing, and installation and proper utilization of appropriate environmental control equipment.  Seller agrees to defend, indemnify and hold harmless Buyer from all claims, actions, losses, damages and expenses resulting from any injury to persons, damage to property or action by any regulatory agency, arising out of or in any way associated with the design, installation, and/or operation of any production formulation, packaging, or support equipment (including equipment owned by Seller, Buyer or Third Parties), used in the production, processing or handling of the product(s) sold hereunder and all raw materials used in the production, including, without limitation, injuries to Seller's employees involved in these operations caused or contributed to by the negligence of those employees or

21

> fellow employees.  Seller agrees to provide $5,000,000 of commercial
> liability insurance in support of this indemnity with companies
> subject to Buyer's approval, which insurance shall carry an
> endorsement naming buyer as coinsured.    Seller expressly
> acknowledges that it will defend and indemnify Buyer against
> personal injury claims of Seller's.

IFF argues that these paragraphs create an obligation for Dammann to "indemnify" IFF for both

"first party damages" and "third party damages" and, thus, IFF's claims under these paragraphs,

as "indemnification" claims, are distinct from its other breach of contract claims and are subject

to the six-year statute of limitations under N.J. Stat. Ann. 2A:14-1 rather than the four-year

statute of limitations under the U.C.C.

### a.    Claims for First Party Damage

IFF admits that the "lion's share" of its damages claimed under the contractual indemnity

provisions are "first party" damage – i.e., a claim by IFF against Dammann for damages suffered

directly by IFF.  Simply referring to a claim as one for indemnification, however, does not make

it so.  First, although the paragraphs above both have the word "indemnification" in their

headers, portions of those paragraphs are explicitly <u>not</u> provisions for indemnification.  For

example, the paragraph entitled "REWORK AND PRODUCT LIABILITY

INDEMNIFICATION" contains, as one would guess from the header, a "rework" provision that

has nothing to do with indemnification.  The first sentence of that paragraph is related only to the

Seller's agreement to  rework defective product.  An agreement that does not become an

indemnification simply because the header of that paragraph contains the word indemnification.

Second, and most importantly, it is axiomatic that a claim for indemnification, whether

contractual or common law, must be based upon the indemnitee's claim to obtain recovery from

the indemnitor for liability incurred to a <u>third party</u>.  "[U]nder a contract of indemnity, 'the

22

promisor undertakes to protect the promissee against loss or liability to a third person."

Feigenbaum v. Guaracini, 402 N.J. Super. 7, 18 (App. Div. 2008).  IFF cites no case law, and this court found none, where a New Jersey court interpreted a first party claim of damages as an indemnity claim.  Rather, such a claim is properly considered an action for breach of contract, negligence, etc.  As Dammann correctly noted, to allow a party to assert a claim for "indemnity" for its own direct damages "would essentially eliminate breach of contract and negligence as causes of action so long as the suing party had an indemnity clause in its contract," (Def.'s Opp'n Br. (Doc. No. 121) at 13-14) and would improperly override the U.C.C.'s specific four-year statute of limitations for contract claims arising out of the sale of goods.  The main case relied upon by IFF in its briefs regarding the statute of limitations for indemnifications claims, Titanium Metals Corp. v. Elkem Management, 87 F. Supp. 2d 429 (W.D. Pa. 1998), also supports the basic tenet that a claim for indemnity results only from payment or settlement to a third party.  In Titanium Metals, the Western District of Pennsylvania held that the indemnity statute of limitations, rather than the U.C.C. statute of limitations, applied to the plaintiff's indemnity claims because the indemnity claims were separate and distinct from the claims for breach of warranty.  Id. at 432-33.  Those indemnity claims, however, were all for liability to a third party.  The Court held that the plaintiff's direct liability claim – the costs of replacing the defective product – was subject to the U.C.C. statute of limitations.  Id. at 433.  Similarly, IFF's alleged "first party" indemnity claims are not indemnity claims at all, but are direct liability claims subject to the four-year statute of limitations under the U.C.C., which accrued at the time of delivery pursuant to N.J. Stat. Ann. 12A:2-725, and are therefore time-barred.

### b.       Claims for Third Party Damage

IFF's Amended and Supplemental Cross-claim does make one mention of third-party

damage.  IFF claims damage in the amount of $412,480 from "claims from customers and

distributors who purchased mercury contaminated finished products."  (Am. & Supplemental

Crosscl. (Doc. No. 109) ¶ 25.)  Here, a closer inspection of the actual indemnity provisions is

necessary.  As discussed above, the first provision relied upon by IFF ("REWORK AND

PRODUCT LIABILITY INDEMNIFICATION") contains both a warranty that the Seller will

"replace, rework and/or scrap any defective product" and a provision for indemnification.  The

provision on indemnification states, "Seller shall be responsible for claims by third parties

against buyer for loss or damage based on personal injury or destruction of property due to

defects in the product for which Seller is responsible."  The next sentence provides that the Seller

will be responsible for the "defense, settlement or other final disposition of such claims" and will

"hold Buyer harmless from any expenses or liability arising out of such claims."  Thus, the

indemnification provided by this provision is limited to claims for "loss or damage based on

personal injury or destruction of property due to defects in the product."  IFF has not alleged that

any third party has made such a claim.  Rather, IFF states only that it has paid "claims from

customers and distributors who purchased mercury contaminated finished products."  (Id. ¶ 25.)

IFF makes no claim that it paid its customers and distributors based on personal injury or

destruction of property.  Thus, IFF has not stated a claim for indemnification under this first

provision.

Similarly, the second indemnity provision relied upon by IFF provides a specific and

limited indemnity.  In the paragraph entitled "PERSONAL INJURY AND PROPERTY

DAMAGE LIABILITY INDEMNIFICATION" the Seller agrees to defend, indemnify and hold harmless the Buyer from claims resulting from personal injury, property damage or actions by a regulatory agency arising from or associated with "the design, installation, and/or operation of any production formulation, packaging, or support equipment (including equipment owned by Seller, Buyer or Third Parties), used in the production, processing or handing of the product(s) sold hereunder and all raw materials used in the production . . . ." Here, the key language is that the claims must arise out of or be associated with "the design, installation, and/or operation of any production formulation, packaging, or support equipment." Again, IFF makes no claim that it paid its customers and distributors for claims arising out of the design, installation, or operation of production formulation, packaging, or support equipment. Thus, IFF has not stated a claim for indemnification under this second provision.

### v.  *Implied Common Law Indemnity*

IFF seeks to assert a cross-claim against Dammann for Implied Common Law Indemnification (Count Five). Again, IFF's claims for first-party damages are not actually indemnity claims, so those claims also fail under a theory of common law indemnity. With respect to IFF's claim of damages in the amount of $412,480 from "claims from customers and distributors who purchased mercury contaminated finished products," this claim also fails to meet the requirements of common law indemnity. "The right of indemnity enures to a person who, without active fault on his own part, has been compelled by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable." Enright v. Lubow, 202 N.J. Super. 58, 85 (App. Div. 1985)(citing Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55, 80 (1960))(emphasis

added).  IFF has made no allegation of any "legal obligation" under which it was compelled to

pay the claimed money to its customers and distributors.  IFF's only argument that it was under a

legal obligation to make this payment is that "because the food flavors and the vanilla extract

made from the vanilla beans were considered to be 'adulterated' by the FDA, they were

prohibited by law from sale to the public."  (Def.'s Reply Br. (Doc. No. 124) at 11.)  The fact that

the food flavors and vanilla extract could not be sold to the public, however, does not give rise to

a legal obligation for IFF to reimburse its customers and distributors for the costs of these

products.  IFF points to no settlement agreement, court order, etc. under which it was obligated to

make these payments.  "Making such a payment to maintain goodwill or other valuable business

relationships, absent a legal duty, does not give rise to a claim for indemnity."  Titanium Metals

Corp., 87 F. Supp. 2d at 431 n.5.  For these reasons IFF has not stated a claim for common law

indemnification.

> ### vi.    Equitable Estoppel

Lastly, IFF argues that the doctrine of equitable estoppel bars Dammann and CBI from

asserting their arguments that the statute of limitations bars IFF's proposed cross-claims.  IFF

argues that "'a party will be estopped from asserting the statute of limitations as a defense to an

admittedly untimely action because his conduct has induced another into forbearing suit within

the applicable limitations period.'"  (Def.'s Mot. to Amend (Doc. No. 109-2) at 29 (quoting Del

Sontro v. Cendant Corp., 223 F. Supp. 2d 563, 571 (D.N.J. 2002)).  IFF contends that it delayed

in filing these claims because "the focus of the litigation has always been to first resolve the

coverage issues through mediation of IFF's underlying claims and through resolution of the

coverage issues through motion practice," and that unsuccessful efforts at mediation "resulted in

a lengthy delay of the case that was further extended by this Court's resolution of Travelers'

coverage motion." (Id. at 28.)  IFF further argues that its cross-claims are "neither stale nor

dilatory" and thus do not run afoul of the two primary purposes of statutes of limitations – to

prevent the litigation of stale claims and "to penalize dilatoriness and serve as a measure of

repose."  (Id. quoting Ochs v. Fed. Ins. Co., 90 N.J. 108, 165-66 (1982).)

     Although IFF's cross-claims may not run afoul of the purposes of statutes of limitations,

it does not necessarily follow that equitable estoppel bars Dammann's defense that the claims are

time barred.  Application of the doctrine of equitable estoppel relates to Dammann's actions

rather than IFF's; in order for the doctrine to apply, Dammann must have tricked IFF into

forgoing a timely filing of the claims or have led IFF to believe that its claims were properly and

timely filed.  As the Supreme Court of New Jersey recently explained,

> With regard to procedural and substantive statutes of limitations, our
> case law reveals that the doctrine of equitable tolling of limitations
> periods has been applied only in narrowly-defined circumstances.
> See, e.g., Price v. N.J. Mfrs. Ins. Co., 182 N.J. 519, 525-27, 867 A.2d
> 1181 (2005) (holding that equitable tolling applied where insurance
> company statements and conduct lulled plaintiff and his attorney into
> believing that plaintiff's uninsured motorist claim was properly filed);
> Freeman v. State, 347 N.J. Super. 11, 31, 788 A.2d 867 (App. Div.
> [2002]) (finding that court may utilize tolling doctrine where one
> party has engaged in overt trickery that induced plaintiff to forgo
> timely filing of complaint), certif. denied, 172 N.J. 178, 796 A.2d 895
> (2002).

R.A.C. v. P.J.S., Jr., 192 N.J. 81, 100 (2007).

     The circumstances of this case are not the narrowly-defined circumstances that would

require the application of equitable tolling of the limitations period.  There is no evidence that

Dammann "engage[d] in conduct that [was] calculated to mislead [IFF] into believing that it

[was] unnecessary to seek civil redress" or that Dammann "lulled [IFF] into a false sense of

security by representing that a claim [would] be amicably settled without the necessity for

litigation." W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 553-54 (1989).

Rather, IFF argues that the doctrine of equitable estoppel should apply here to allow its otherwise

time-barred claims because IFF "reasonably relied on the prolonged efforts of the parties and the

Magistrate Judges' [sic] handling this matter in attempting to settle all claims through

mediation." Such efforts by the parties and the court, however, were certainly not trickery or

deceit and were not designed to lull IFF into sitting on its rights. No one made any promises to

IFF regarding the resolution of its claims or the tolling of the statute of limitations until the

mediation or the coverage issues were completed.[4]

### III. CONCLUSION

For the reasons set forth above, IFF's appeal of Judge Shipp's Order and motion for leave

to file an amended and supplemental cross-claim will be denied. The court will enter an order

implementing this opinion.


                     s/ Dickinson R. Debevoise
_____            DICKINSON R. DEBEVOISE, U.S.S.D.J.
_____


Dated:        December 22, 2008

_____

[4] Indeed, IFF filed its initial motion to assert these cross-claims on February 8, 2008 – three days before the court issued its coverage opinion. Rather than having been lulled into postponing the filing of its claims, it seems that IFF intended to file them just before it thought the statue of limitations was going to run.

28